OPINION OF THE COURT
John R. LaCava, J.
Defendant Louis Cipolla, a former United States customs officer and firearms instructor, is charged under indictment number 94-1680 with various crimes arising out of a bombing incident that took place on May 18, 1994. They include: attempted arson in the first degree; criminal possession of a dangerous weapon in the first degree; and arson in the third degree. By indictment number 94-0999, he is also charged with numerous other crimes, the commission of which were discovered upon the investigation of the charges underlying indictment 94-1680. Criminal possession of a weapon in the third degree (11 counts) and criminal possession of a dangerous weapon in the first degree are among those charges.
By decisions and orders dated March 21, 1995, May 9, 1995 and July 17, 1995, I ordered a pretrial hearing to resolve the various factual issues that had been raised in defendant Louis Cipolla’s pretrial motions to, inter alla, controvert search warrants and to suppress physical evidence.[1] The hearings were conducted between September 10 and 28, 1995.1 now make the following findings of fact, based upon the credible evidence, and reach the following conclusions of law.[2]
*377 FINDINGS OF FACT
In the early morning hours of May 18, 1994 an improvised explosive grenade-like device was detonated on the property of 125 Second Street, Verplanck, New York, the family residence of Gary and JoAnn Dykeman.[3] Although no one was injured, the explosion damaged, among other things, an automobile which was parked in front of the Dykeman residence.
The State Police were called to investigate the incident. Senior New York State Police Investigator Gregory J. Harlin was assigned to head the investigation.
A search for evidence at the Dykeman residence commenced on the morning following the explosion. At approximately 11:45 a.m., while the search continued, Harlin spoke by telephone to Gerard Haifa, a group supervisor with the Federal Bureau of Alcohol, Tobacco and Firearms (BATF), to advise him about the incident.
Agent Haifa is assigned to a multidepartmental task force comprised of BATF agents, United States postal inspectors and New York City police detectives. The task force had been formed to investigate three associated mail bombings. The first, a murder, occurred in 1982. The second happened in October 1993. The third took place in November 1994 and was targeted at a United States customs officer named McGarrell.
In response to Harlin’s call, Haifa advised Harlin that he and his staff would be available to assist in the State Police investigation. No further Federal involvement was anticipated at that time.
What would turn out to be the first of three State warrants to search the Cipolla residence was obtained by New York State Police Investigator Bruce Cuccia at approximately 7:35 p.m. on May 20,1994. As with all State warrants, it is addressed to "Any member of the State police.” Upon obtaining the warrant, Cuccia returned to Verplanck to search for Cipolla. Peters and Cipolla were eventually arrested at approximately 12:35 a.m. the next day.
At about 1:20 a.m., Cuccia, Harlin, and approximately seven other State Police officers began searching Cipolla’s residence upon the authority of the warrant. Prompted, in part, by the discovery in Cipolla’s home of newspaper articles concerning the McGarrell mail bomb incident, Harlin made another call to the Federal authorities.
*378 The information was routed to BATE Group Supervisor Raffa at approximately 2:00 a.m. from BATF’s Washington, D.C. command center. During this two-to-three-minute call, Raffa was told that a United States customs officer had been involved in a bombing incident and was provided with Harlin’s name.
Raffa then called Harlin who informed him that the State Police had arrested two individuals in connection with the incident. Additionally, Raffa was told that during the execution of a search warrant at one of the suspect’s homes, the State Police discovered explosives, weapons, a machine shop, and newspaper clippings regarding the McGarrell incident.
Raffa then called Kristin Becci, a lead agent in the McGarrell investigation. He told her that there might be a break in their case. He reached this conclusion because: like McGarrell, Cipolla was a customs officer; Cipolla was involved in the detonation of an improvised explosive device; Cipolla had several newspaper articles relating to the McGarrell incident, one of which had McGarrell’s name highlighted; and Cipolla’s residence contained a workshop that could be used to manufacture explosive devices.
Agents Raffa and Becci arrived at the Peekskill Barracks between 4:30 and 5:00 a.m. They were directed to Cipolla’s house where they were greeted by Harlin at Cipolla’s door. They were invited into the living room. Other State Police were also present. Harlin advised Raffa and Becci that they were waiting for an amended warrant. Harlin then gave Raffa and Becci a full briefing which was followed by a "quick tour” of the premises. The tour lasted about a half hour.
Agents Raffa and Becci were shown areas where various weapons were found. This "tour” included the viewing of a seven-by-eight-foot hidden closet in which numerous weapons were stored. They were also shown the McGarrell newspaper articles and, among other things, lathes, tools, silencers, Cipolla’s workshop and office area. Neither agent seized any items.
Raffa and Becci returned to the Peekskill Barracks to summon the other members of the task force. While waiting there, Agent Raffa attempted to reach Kirby Heller, an Assistant United States Attorney (AUSA) for the Eastern District of New York. Between 9:00 and 10:00 a.m., he also saw silencers, long guns, grenade sandbags, black powder and assorted ammunition being returned to the barracks from Cipolla’s home.
Having failed to reach Heller, Raffa telephoned Charlie Rose, then an Assistant United States Attorney for the Southern *379 District of New York, to see if Rose could reach her. Raffa informed Rose that in response to the call from Washington about a bombing incident, he had gone to Peekskill where he was briefed and had been given a "tour” of the suspect’s premises. Raffa also told Rose about what Harlin had told him over the phone and what he had observed being brought back to the barracks from Cipolla’s home.
Rose ultimately learned from his collective telephone . conversations with BATF Agents Raffa, Beehan and Becci that Cipolla, a retired customs officer and current firearms instructor, was suspected of having thrown an improvised explosive device. He was also told that the allegation was corroborated in a typewritten statement that Peters had made to the State Police and in a body-wire recording of a conversation had between Cipolla and Peters. He also learned that the State Police had seized, from Cipolla’s home, illegal firearms, explosive devices, .22 caliber shell casings, tools, and various books, including the Anarchist’s Cook Book, a book detailing the manner of construction of numerous types of explosive devices that is often possessed by terrorist groups and with which Rose was familiar.
Rose recalls that Raffa informed him that items from the Cipolla search were being returned to the Peekskill Barracks. These items included weapons, books, residue, rifles and shotguns. Additionally, Rose knew that Raffa had been briefed by the State Police. Upon preparing his affidavit in support of the warrant, therefore, he focused on what the State Police had learned during their investigation. Additionally, when interviewing Raffa, Rose focused on what the State Police had told Raffa before Raffa had "toured” the Cipolla residence. This was because he was interested in knowing what had prompted Raffa to go to Peekskill in the first place on what appeared to be a State matter.
Rose then prepared his affidavit in support of the Federal warrant. United States Magistrate Nina Gershon issued the warrant at approximately 2:40 p.m.
Turning back to 5:30 a.m. at the Peekskill Barracks, Cuccia was preparing an affidavit in support of a second State warrant.[4] This was prompted by observations made under the authority of the first warrant. Aside from removing dangerous materials, briefing the Federal agents, and giving them a "tour” of the premises, the State investigation was at a stand *380 still pending the outcome of the amended warrant application. Upon obtaining the amended warrant, the State Police recommenced their search.
In the meantime, the Federal authorities were moving forward with their investigation. Rose called BATF Agent Beehan to advise him that the Federal warrant had been signed.
Rose traveled to the Peekskill Barracks with the Federal warrant. Once there, he was directed to the Cipolla residence to join the members of the task force who had left the barracks for the house at about 2:30 p.m. Rose brought the warrant to the Federal agents who were waiting outside.
The Federal search was as thorough as the State search. It lasted approximately four and a half hours. Among the items seized by BATF agents during the execution of the Federal warrant were: address labels; books pertaining to explosive devices and firearms; .22 caliber ammunition; a soldering kit; assorted nuts, bolts, screws and washers; hacksaws with blades; pipe cutter and other assorted tools; assorted glues; Jiffy bags; maps; disassembled handgun parts; assorted silencers; wire; two newspaper articles concerning McGarrell letter bomb, one of which was copied and highlighted; a manual Olympia typewriter; assorted documents; assorted firearms including a cut down shotgun.
On May 26, 1994 Harlin and Cuccia applied to Justice McCarthy for and were issued a third State warrant. Although Federal task force members were present, only the State Police physically searched the premises.
No Federal charges were ever brought against Cipolla. Property seized under the Federal warrant was turned over to State officials for prosecution. In the end, the State possessed all weapons, documents, machinery, tools, photographs, explosives, and other materials that had been taken from the Cipolla residence.
These indictments followed.
CONCLUSIONS OF LAW
1. The Federal "Tour”
During the early morning hours of May 21, 1994 Federal agents entered into the Cipolla residence. They were given a "tour” of the premises by the State Police who were lawfully there under the authority of the first State warrant.
As preliminary matters, I find that the Federal presence in the residence constitutes a search even though the Federal *381 agents neither moved nor removed any property (see, People v Mercado, 68 NY2d 874 [1986]; see also, People v Herman, 144 AD2d 485 [2d Dept 1988]). Secondly, I conclude that the principal and only significant reason for which the Federal task force went to Verplanck was to further investigate the mail bombings for which it was created. Any assistance that its members may have given to the State Police was marginal and incidental to their primary purpose.
An issue of first impression in New York State is whether Federal agents may lawfully search a premises upon the authority of a valid State search warrant issued in connection with another criminal transaction and directed to "any member of the New York State Police,” where the Federal agents are investigating an unrelated criminal transaction, and have probable cause and time to obtain a separate Federal warrant. Two Federal Circuit Courts have reached opposite conclusions on similar issues.
In United States v Sanchez (509 F2d 886 [6th Cir 1975]), Toledo, Ohio drug enforcement officers obtained a warrant to search defendant’s residence for narcotics. They asked that an explosives expert from the BATF accompany them because they also received information that explosives would be found. The Federal agent accompanied the State officers "for the specific purpose of searching for and seizing [explosives]” {supra, at 888, n 1). Explosives were eventually seized by the Federal agent. The court found that two different agencies were simultaneously searching for different types of property relating to independent crimes.
In suppressing the explosives, the court held that the State warrant "could not be used to validate the entrance of a federal officer having both probable cause and the opportunity to obtain a separate warrant to search for different items of property” (supra, at 889). Upon the finding that the Federal presence was unlawful, the court declined to apply the plain view doctrine because the viewing officer was not legally in the position from which he viewed the property (supra, at 889). Consequently, the court concluded that each independent search required its own warrant, and upheld the suppression of the explosives.
The holding in United States v Johnson (707 F2d 317 [8th Cir 1983]) is directly contrary to Sanchez (supra). In Johnson, county police had probable cause to believe that drugs and firearms would be found at the defendant’s residence. They obtained a search warrant only for the seizure of drugs and re *382 lated paraphernalia. "Since there apparently were no state charges that could be brought concerning the firearms”, a BATF agent was asked to participate in the search {supra, at 319). A .38 caliber revolver and sawed-off shotgun were seized.
In denying the suppression motion regarding the Federal firearms prosecution, the court saw no impropriety with the BATF agent’s search of the premises under the State warrant, even though his goal was completely separate and distinct from the State goal, and there existed probable cause to obtain a Federal warrant. The court found that the State warrant was acquired in good faith and that there was collaboration on the part of the State and Federal agencies, notwithstanding the fact that the BATF agent was there to investigate a crime unrelated to drug possession.
In upholding the Federal search, the court stated that since the Federal authorities were legally there under the State warrant, and the State warrant was not used as a subterfuge for a warrantless Federal search, the firearms were legally seized under the plain view doctrine (supra, at 321).
Upon review and consideration of the countervailing principle, concerns and policies behind these two positions, I choose to follow Sanchez (supra). The Fourth Amendment was designed by the framers of the Constitution to prevent against general searches by government officials. The warrant requirement was enacted so that an independent Magistrate stands as a buffer between the search of a person’s home by law enforcement officials and that person’s right to privacy. "The requirement that a judicial officer make a probable cause determination insures that there exists a legal basis for the search” (supra, at 889, citing McDonald v United States, 335 US 451 [1948]). "These constitutional requirements were designed to eliminate the pernicious general warrant” (United States v Sanchez, supra, at 889).
An approval of BATF’s entry into the Cipolla premises to investigate a crime unrelated to that for which the State Police were present would open the door to possible abusive general searches by investigating agencies. In short, investigatory agencies, with probable cause and time to obtain a warrant, would be permitted to conduct independent investigations under the authority of a warrant issued to another agency which has a wholly independent goal, without first having a Magistrate review the nature and extent of their intrusion. Under such a scenario, any agency would have the authority to search a premises for any items, as long as one participating *383 agency acquired a warrant in good faith granting it the legal right to search the premises in question.[5] While abuses may be cured by the suppression of evidence at trial, the warrant requirement was designed to prevent illegal police conduct before it occurs (People v Garriga, 189 AD2d 236, 239 [1st Dept 1993]). "To provide the necessary security against unreasonable intrusions upon the private lives of individuals, the framers of the Fourth Amendment required adherence to judicial processes wherever possible” (Trupiano v United States, 334 US 699, 705 [1948]).
2. The "Independent Source” Rule
A search warrant based solely on information gleaned from an illegal search must fall. A warrant will be sustained under the "independent source rule”, however, where despite an unlawful search the warrant is based on information gathered from lawful sources before and independent of the illegal entry (People v Arnau, 58 NY2d 27 [1982], cert denied 468 US 1217). The Arnau holding was further clarified in People v Harris (62 NY2d 706, 708 [1984]) wherein the Court stated: "The validity of the warrant to search the apartment based upon * * * properly obtained information, would not be tainted even if the same application contained unlawfully acquired information; provided, of course, that the lawfully acquired information is sufficient to provide probable cause for the search.”
Based upon the credible evidence, I am satisfied that the Federal Magistrate was presented with evidence that was grounded upon information independent of the illegal "tour”, and that this evidence is the basis upon which probable cause was founded.
CONCLUSION
Based upon the foregoing, the motion to controvert the Federal warrant and to suppress evidence is denied.

. Codefendant Christopher Peters neither joined in the motions nor participated in the hearings.

. This decision and order has been edited for publication. Findings of fact and conclusions of law addressing, among other things, numerous legal issues raised in connection with State-issued search warrants, other issues addressed to the propriety of the Federal warrant, and issues concerning the admissibility of defendant’s statements have been redacted.

. The Dykemans are the editors of the Cortlandt Observer, a local newspaper which had, for a period of time, published local history articles submitted by Mr. Cipolla.

. This warrant is referred to as the "amended search warrant”.

. This determination in no means nullifies interagency cooperation and assistance regarding the investigation of the same or related cases.