**BROWN et al. v. UNITED STATES.**

Nos. 5846–5848.

Circuit Court of Appeals, Third Circuit.

April 14, 1936.

Harold Simandl and George R. Sommer, both of Newark, N.J., for appellants.

William F. Smith, of Trenton, N.J., for appellee.

Before BUFFINGTON and DAVIS, Circuit Judges, and AVIS, District Judge.

DAVIS, Circuit Judge.

This is an appeal from a judgment entered on the verdict of a jury upon an indictment charging that the defendants "did willfully, knowingly, unlawfully and feloniously receive and conceal and facilitate the transportation and concealment of a quantity of narcotic drugs" fraudulently imported into the United States in violation of the "Narcotic Drugs Import and Export Act," 21 U.S.C.A. § 174.

The question raised in this case concerns the propriety of the admission of evidence obtained in a search of a dwelling house authorized by an admittedly invalid search warrant.

On November 9, 1934, Frederick W. Morris, a secret service agent, upon an affidavit made by him obtained a search warrant from United States Commissioner Holland to search a frame dwelling house located at 737 Clinton avenue in the city of Newark, N. J. Ten days later, November 19, 1934, Morris, accompanied by secret service agent Sullivan; narcotic agents E. A. Feimster, William Schlossberg, and J. C. Peiper; and by state detectives Henry Morganroth and Frank Hill, searched the premises. The following day Morris made his return on the search warrant as follows:

"Upon said search I found and duly inventoried the seized property as follows: 55 toys of opium, approximately 4,125 grains; 2,244 ampules of 2% cocaine solution; 3 jars half full of smoking opium; one jar full, 10 oz. in all; one small paper box, 125 grains yen shee; 3 boxes empty toys; 7 empty jars; one smoking outfit. Five bottles of yen shee wine, one quart approximately."

Before the trial on motion of defendants' counsel to quash the search warrant, and suppress the evidence, the court, with the consent of the government, quashed the search warrant, but refused to suppress the evidence on the ground that it was obtained as an incident to a lawful arrest.

Was the search made and the evidence obtained as an incident to a lawful arrest or under the authority of the search warrant? The government insists that the search was not made and the evidence obtained by virtue of the search warrant. Morris testified at the trial that he rang the bell of the house; that Mrs. Gillman, mother of Lillian Brown, came to the door and he said to her, "We are officers," and then after agent Feimster had gone into the house ahead of him, he told her that he had a search warrant; that while he was talking to her a woman ran from a room on the right toward the rear and entered a room there; that Feimster ran after her and after talking with her a "couple of moments" said: "Here's Lil Brown here." Morris then instructed Feimster to take her into the living room, and he subsequently arrested her. It is the government's contention that the evidence was obtained as an incident to this arrest. But on the day following the search, November 20, 1934, when the evidence was obtained, Morris, who made the affidavit on which the warrant was issued, made a sworn return to the search warrant in which, in addition to what is stated above, he said:

"I, Frederick W. Morris, the officer by whom this warrant was executed, do swear that the above inventory contains a true and detailed account of the property taken by me on the warrant.

"I further certify and swear that a copy of this warrant, together with a detailed receipt for the said property taken was given to Mrs. Lillian Brown, the person from whom it was taken, given to her, the person in whose possession it was found, left in the place where the said property was found.

"F. W. Morris.

"Sworn to and subscribed before me this 20th day of November, 1934.

"Jos. F. Holland,
"United States Commissioner,
"District of New Jersey. [Seal]."

The concealment and transportation of the property inventoried and mentioned above constituted the crime for which the appellants were indicted. Knowledge of this crime was obtained by the invalid search warrant.

Feimster said that while agent Morris was talking to Mrs. Gillman, he saw some one run toward the rear of the house and he rushed by Mrs. Gillman and ran back to the rear of the house "to see what Mrs. Brown was doing."

Morganroth said: "On the morning of November 19th, with officers, mentioned by Mr. Peiper, we went to 737 Clinton Avenue

and Mr. Morris went and I believe Mr. Feimster was with us, and myself, went to the front door. Mrs. Gillman opened the door, she said she was in charge of the house and we walked in and Mr. Morris told her he had a search warrant for the house. We entered the first room on our right, Neubert was in bed."

He further testified as follows:

"Q. Were you in company with Officer Morris of the Secret Service Department? A. I was.

"Q. And did you step up to the door, the front door? A. I was with him at the time.

"Q. With Officer Morris? A. Yes.

"Q. Did you ring the bell? A. Yes.

"Q. And Mrs. Gillman came to the door? A. Yes.

"Q. Did you have the search warrant with you? A. Mr. Morris had the search warrant.

"Q. Did Mr. Morris show Mrs. Gillman it? A. He read the search warrant to Lillian Brown.

"Q. I am talking about when he rang the bell. A. He had it in his hand, I don't know whether he showed it.

"Q. Did he say, 'I have a search warrant?' A. Yes.

"Q. And then Mrs. Gillman said, 'All right, come in'? A. That is right.

"Q. And you stepped in with Mr. Morris? A. I did.

"Q. After you had finished with the house, you went to the garage? A. Yes."

Mrs. Gillman testified as follows:

"Q. Answer yes or no. Do you remember what happened that morning? A. Yes.

"Q. And will you tell the Court and jury just what happened after the doorbell was rung? A. Well, they rang the bell, and I opened the door, and they said they were United States —

"The Court: Can you gentlemen hear? All right.

"Q. Speak loud enough so I can hear you, Mrs. Gillman, please. A. They said they were United States service men, and they said they had a warrant, search warrant, and I says, I asked what they wanted, and they said they had a search warrant, and I said 'Well you can't come in' and they said, 'Well, we have a search warrant to search the house.'

"Q. And did Officer Morris show you the search warrant at that time? A. I didn't read it but they had the search warrant in their hands, a paper anyway."

It is evident that the government officers entered the dwelling under the guise of having a legal search warrant. Morris said: "I do swear that the above inventory (the evidence in question) contains a true and detailed account of the property taken by me on the warrant." When the search warrant was quashed, as it should have been, the evidence which Morris swore he obtained "by making the search as within directed" by the warrant should have been suppressed.

The officers had no warrant for the arrest of Lillian Brown or any one else in the house which the warrant authorized Morris to search. The government tries to justify the failure to suppress the evidence and its admission on the theory that Feimster rushed by Mrs. Gillman and arrested Lillian Brown before Morris told Mrs. Gillman that he had a search warrant. The evidence upon a fair construction does not support such a theory or conclusion. The Fourth and Fifth Amendments to the Constitution may not be construed to justify such an entrance into a private dwelling and thus thwart their plain purpose, however zealous and sincere officers may be.

But assuming that we are mistaken in this position, that Morris did not tell Mrs. Gillman that he had a search warrant; that he did not show it to her until after Lillian Brown had been arrested, and did not enter the house by virtue of the search warrant, was the evidence which the officers obtained under the facts of this case admissible?

The house was a private dwelling in which the proprietress with her family lived. She also kept roomers. It was not a hotel, restaurant, or public place where the public was invited or had the right to come and go at will. Into this home the officers of the government practically forced themselves without the semblance of authority, for they did not see any crime being committed and did not even have probable cause sufficient to justify the issuance of a search warrant, or probable cause to believe that Lillian Brown had committed a felony. The existence of probable cause does not justify the search of a private dwelling without a search warrant. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261,

65 L.Ed. 647; Agnello v. U. S., 269 U.S. 20, 32, 33, 46 S.Ct. 4, 70 L.Ed. 145, 51 A.L.R. 409; United States v. Lefkowitz, 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775.

If they could not enter this home by virtue of the authority of the search warrant, as the government now admits they could not, a fortiori, they had less authority under the facts of this case to enter without a search warrant. This search, made in violation of the constitutional rights of the defendants, cannot be cured, justified, and legalized by the discovery of a crime while making the illegal search. Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. Evidence thus obtained may not be used, when timely steps are taken to suppress it. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, L.R.A.1915B, 834, Ann. Cas.1915C, 1177; Silverthorn Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426.

■ Carinelli and Neubert were roomers in the house. It was their home and so far as the unlawful search affected them, it violated their constitutional rights.

■ The entrance into the house was unlawful and the officers were trespassers. As such, they had no right to make an exploratory search of every room in the house from cellar to attic, ransacking every closet, dresser, drawer, or piece of clothing, obtaining the key to some of the doors of the garage by threats and breaking down others. Any evidence obtained during and by means of such search may not be used against the defendants. United States v. Lefkowitz, supra; Byars v. United States, supra; United States v. 1013 Crates of Empty Old Smugglers Whiskey Bottles (C. C.A.) 52 F.(2d) 49; Go-Bart Importing Company v. United States, 282 U.S. 344, 51 S.Ct. 153, 75 L.Ed. 374.

It is to be regretted that persons unlawfully possessing, concealing, or in any way unlawfully dealing in narcotics may escape conviction, but that fact cannot justify the violation of the Fourth and Fifth Amendments to the Constitution. In other words, a conviction may not be sustained at the expense of the rights guaranteed to defendants by the Constitution.

It is further urged that the court erred in permitting the government to introduce evidence of the previous conviction of the defendant Carinelli.

■ If a defendant testifies, like any other witness, he may be questioned, within well-defined limits, as to a previous conviction for the purpose of affecting his credibility, but not having testified and not having put in issue his credibility or his reputation for good character, evidence impeaching his credibility or showing a previous conviction is not admissible. The testimony of the previous conviction of Carinelli should not have been admitted, and when the fact of Carinelli's previous conviction was included in the answer to a proper question, upon request or motion, it should have been stricken out. Mansbach v. United States (C.C.A.) 11 F.(2d) 221; Mercer v. United States (C.C.A.) 14 F.(2d) 281; Weiner v. United States (C.C.A.) 20 F. (2d) 522.

The judgments appealed from are reversed.