THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THOMAS GARRIGA, Appellant.

First Department, April 6, 1993

### APPEARANCES OF COUNSEL

*Cyrus Benson III* of counsel *(Haliburton Fales* with him on the brief; *White & Case,* attorneys), for appellant.

*Magda S. Vives* of counsel *(Allen H. Saperstein* with her on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

### OPINION OF THE COURT

CARRO, J. P.

Defendant's appeal from his conviction, after jury trial, of criminal possession of a controlled substance in the third degree and criminally using drug paraphernalia in the second degree brings up for review the denial, after a hearing, of his motion to suppress evidence seized in his room in a rooming house, and the propriety of the court's rulings at the motion to suppress and at the trial which limited the defendant's cross-examination of the arresting officers with regard to the circumstances immediately preceding their entry into the defendant's rooming house.

On June 26, 1988, at 11:18 A.M., Police Officers Walter Wasilewski and Alfredo Toro overheard a radio run reporting a black male with a gun in the rear of 1671 Popham Avenue in the Bronx. Neither response nor backup was requested of the officers by the dispatcher. Nevertheless, approximately 25 to 30 minutes later, after aiding an elderly motorist who was

changing a tire, the officers arrived at 1671 Popham Avenue, having decided on their own to "back up" the call. When they arrived, one or two other police units were already present with a number of officers congregated by their vehicles parked in front of the building. Nonetheless, according to the testimony of the two officers, they ignored their colleagues and, without communicating with them, proceeded past them directly to the front door of the building which they believed to be a private home, although it was in fact a rooming house. Without knocking or announcing their presence, they entered with guns drawn.

After proceeding upon a circuitous path through doorways, hallways and up and down stairs, the officers testified that they came upon the defendant standing in the doorway to his room, exchanging a plastic bag of white powder for cash with another man. According to the officers, the purchaser, upon seeing them, barreled past them in the narrow hallway while they had their guns drawn, and escaped through a kitchen-in-common window with his purchase. One of the officers then attempted to cuff the defendant, still in his doorway. The defendant resisted, and during the struggle that followed, the defendant fell into his room where the officer, who was grappling with him, saw in plain view drugs, paraphernalia, and ammunition, as well as over $10,000 cash. The defendant and his girlfriend, who was in the room as well, were arrested.

■ Initially, we observe that Officers Wasilewski and Toro, under the facts known to them at the time, took it upon themselves to enter, with guns drawn, what they believed to be a private home without knocking or even announcing themselves. There were no exigent circumstances, since the officers were responding belatedly, and further, they proceeded to invade what they believed to be a private home without making any effort to determine whether the officers at the scene had already entered the house or otherwise investigated. Had the house been, in fact, a private home as they believed, their conduct would be constitutionally impermissible (see, People v Levan, 62 NY2d 139).

Even assuming, arguendo, that the internal hallways of a rooming house are entitled to a lesser degree of privacy protection, the officers' discovery after their entry that the premises was a rooming house does not vitiate the taint arising from the circumstance that they came to that discovery via conduct which they should have understood to be constitutionally impermissible. In our view, police officers may

not be free to raid or roust and then, when their efforts yield results which can provide a post hoc justification for their conduct, evade, through backwards reasoning, their obligation to act in accordance with the Constitution in the first place. "A search is good or bad when it starts and does not change character from its success" *(People v McCarthy,* 14 NY2d 206, 209).

The primary purpose of the exclusionary rule is to deter future unlawful police misconduct *(People v Young,* 55 NY2d 419, 425, *cert denied* 459 US 848). " 'In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generated through its deterrent effect, rather than a personal constitutional right of the party aggrieved' " *(supra,* at 425, quoting *United States v Calandra,* 414 US 338, 348). Because of this, "courts have recognized that its purpose would not be furthered by applying it in instances where the police, believing that they are acting lawfully, engage in a search which later turns out to be 'unlawful' because, in hindsight, their reasonable reliance on the consenting person's authority proves to be erroneous" *(People v Adams,* 53 NY2d 1, 9, *cert denied* 454 US 854). By parity of reasoning, the exclusionary rule, if it is to serve its central purpose of deterring future unlawful police conduct, should be applied in those instances where, as here, the facts reasonably perceived by the police indicate that fundamental constitutional privacy rights are being infringed, even if it should later turn out that those rights are lesser in degree than they first appeared. "An assessment of probable cause turns on what was reasonably and objectively in the mind of law enforcement authorities" *(People v Jennings,* 54 NY2d 518, 523). Here, objectively and reasonably in the minds of the officers, they were proceeding into a private home, and thus the constitutional reasonableness of their actions should be evaluated on that basis.

In any event, if the common hallway area of this rooming house falls within the definition of the defendant's home for the purposes of Fourth Amendment analysis, the officers had no authority to enter without a warrant absent exigent circumstances. Although the Court of Appeals has not yet ruled squarely on the issue, existing precedent, although sparse, supports the conclusion that the internal hallway area of this rooming house was part of the defendant's home for Fourth Amendment purposes.

In *People v Powell* (54 NY2d 524), the Court examined the issue of whether the lobby of a men's shelter, at which the defendant resided, was part of his "home" within the meaning of the exclusion provision of Penal Law § 265.02 (4) for possession of a loaded weapon in a person's home. The Court affirmed the correctness of the jury instruction that a home may " 'extend to facilities shared by several persons not related to each other' but does not encompass a place 'to which the public or a substantial group of persons has access' " *(supra,* at 526). Significantly, in that opinion, the Court cited with approval the opinion in *People v Bargeman* (92 Misc 2d 173), which held that the common hallways of a single-residency hotel were within the ambit of the defendant's home, again within the meaning of Penal Law § 265.02 (4) (54 NY2d, *supra,* at 530-531). The one appellate case clearly on point holds that the common hallways of a rooming house are not "public places" within the context of Fourth Amendment analysis *(People v Lott,* 102 AD2d 506 [4th Dept]). Two other cases, from the First and Second Departments, respectively, also support this proposition, albeit more obliquely *(People v Rodriguez,* 159 AD2d 201, *lv denied* 76 NY2d 742; *People v McCurdy,* 86 AD2d 493).

The cases cited by the People in support of their contention that the defendant had no reasonable expectation of privacy in the inner hallway of the rooming house are distinguishable. In *People v Kozlowsi* (69 NY2d 761), the police reached the defendant's front door by means that he had made available for public access to his house, thus they did not intrude into any area in which defendant had a legitimate expectation of privacy. *People v Powell (supra)* dealt with a common lobby outside a group residence, and explicitly distinguishes itself from the facts in *People v Bargeman (supra). People v Marzan* (161 AD2d 416, *lv denied* 76 NY2d 860) dealt with the hallway of an apartment building, and *People v Maltese* (149 AD2d 626, *lv denied* 74 NY2d 743) dealt with a police officer's observation through a window into the defendant's apartment, made while the officer was standing at the door of the apartment.

Accordingly, we believe that the officers here, by entering the internal hallways of the defendant's rooming house to find him engaged in a criminal transaction, entered the defendant's home in a constitutional sense. This, under the facts at hand, they were not empowered to do. We find pertinent and persuasive the court's analysis in *People v Bargeman (supra,*

at 176): "The instant case presents a cross between the large multiple dwelling and the apartment occupied by unrelated people. It would appear, however, to be closer to the latter. Access to the areas shared in common is tightly controlled. Such areas are not simply passed through during ingress and egress. Nor are they simply devoted to recreational and similar activities. They are shared for eating and bathing purposes essential to daily living and facilities for which are commonly found in any home. And the hallway is the connecting link between them and the sleeping rooms as are hallways and corridors in any home."

There is, too, in our view, importance on another level in finding the common internal hallway area of a rooming house a private, as opposed to a public place, which arises from our obligation as Judges to construe and vindicate constitutional safeguards in a class-neutral manner. (See, State v Mooney, 218 Conn 85, 588 A2d 145, cert denied — US — , 112 S Ct 330, which held that under the Fourth Amendment a warrant was required to search the cardboard box of a homeless person living under a bridge.) Clearly, it is economic necessity that requires those who live in such humble circumstances to dwell there. That they cannot afford to have their own kitchens and bathrooms, and hallway access thereto, does not render such areas "public" with respect to the constitutional prerequisites for permissible entry by the police.

The privacy interests here sought to be vindicated might well be analogized to the common practice among middle-income persons of renting a "group home" for the summer or winter, in which each person or couple occupies a bedroom, but shares kitchen and bathroom facilities. Although privacy in common areas is thereby relinquished to some extent with respect to the other residents, it could not be seriously contended that the police are thereby permitted to enter such premises without announcing their authority, and to roam freely therein with guns drawn, without a warrant or exigent circumstances, neither of which was established here. The courts have already allowed inroads on the privacy of the inner-city poor when they are on their neighborhood streets, because those streets are almost invariably described as "high crime areas" or the like, which is a factor that the police are permitted to take into account when a citizen's behavior is interpreted as suspicious or innocuous. We should vigilantly guard against permitting similar inroads upon the reasonable expectations of privacy of the lesser situated of our citizens

who are forced by economic circumstances to reside in rooming houses.

■ We also find reversible error in the excessive constraints placed upon defense counsel in cross-examination of the People's witnesses both at the *Mapp* hearing and at trial. Counsel was precluded from questioning the arresting officers in this case about the other officers who responded to the 911 call before they did. Those officers were present at the scene with the officers involved herein, yet defense counsel was not permitted to inquire about what, if any, actions those other officers had taken with respect to the radio run. The court repeatedly ruled these were collateral matters. We disagree, and conclude that the precluded questions were relevant to the issues presented both at the *Mapp* hearing and at trial, to wit, whether other officers had investigated the "man with a gun" radio call and what, if anything, was thereby revealed, as well as the over-all credibility of the testifying officers. We find this particularly troubling inasmuch as these officers testified that they entered this apparently private house with guns drawn approximately 25 to 30 minutes after the initial call, and some time after there had been a response by other officers, without knowing what the result of that response was.

While we recognize that the trial court is vested with authority, to be exercised with sound discretion, to determine the permissible scope of cross-examination in any particular case, such exercise is not beyond the reach of appellate review *(People v Dickman,* 42 NY2d 294, 297), and "[w]here the right to cross-examine has been significantly curtailed, reversal will be required even without a showing of specific prejudice" *(People v Carter,* 86 AD2d 451, 458). The defense's position was that the testimony of the two police witnesses was incredible. Full exploration of their account of events that morning might have supported that hypothesis. The 911 call, the results of any investigation by police officers already at the scene, and the circumstances prompting the arresting officers' actions were all relevant and material to the defense. "The generally accepted view is that facts are not 'collateral' if they are relevant to some issue in the case, or if they are independently admissible to impeach the witness" (Richardson, Evidence § 491, at 478 [Prince 10th ed]). "As to those accused of crime, it should be too obvious to need reiteration that restrictions on the right to cross-examine key prosecution witnesses can deprive a defendant of an important means of combating inculpatory testimony or at least demonstrating the existence

of a reasonable doubt as to guilt" *(People v Gissendanner,* 48 NY2d 543, 548). Under our Sixth Amendment Confrontation Clause, the defendant was entitled to considerably more leeway in making his case before the jury, especially where he was charged with a class A-I felony carrying a maximum sentence of 25 years to life. Thus, if we were not granting the defendant's motion to suppress, we would nevertheless have reversed the conviction and ordered a new trial.

Accordingly, the judgment of the Supreme Court, Bronx County (Arlene Silverman, J.), rendered September 12, 1990, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree and criminally using drug paraphernalia in the second degree, should be reversed, on the law and on the facts, the motion to suppress should be granted, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.

ELLERIN, ASCH and RUBIN, JJ., concur.

Judgment of the Supreme Court, Bronx County, rendered September 12, 1990, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree and criminally using drug paraphernalia in the second degree, is reversed, on the law and on the facts, the motion to suppress is granted, and the indictment dismissed. The matter is remitted to the trial court for the purpose of entering an order in favor of the accused pursuant to CPL 160.50, not less than 30 days after service of this order upon the respondent, with leave during this 30-day period to respondent to move and seek any further stay of the implementation of CPL 160.50 as in the interest of justice is required.