616 S.E.2d 744

**James Gregory LOGAN**

v.

**COMMONWEALTH of Virginia.**

**Record No. 0852-04-3.**

Court of Appeals of Virginia,
Salem.

Aug. 2, 2005.

Haley, J., issued dissenting opinion.

S. Jane Chittom, Appellate Defender (Virginia Indigent Defense Commission, on briefs), for appellant.

Margaret W. Reed, Assistant Attorney General (Jerry W. Kilgore, Attorney General, on brief), for appellee.

Present: BENTON, ELDER and HALEY, JJ.

JAMES W. BENTON, JR., Judge.

A police officer entered the rooming house where James Gregory Logan resided, saw Logan in possession of cocaine on the second floor, and arrested Logan. At a hearing on a motion to suppress the cocaine, the trial judge ruled that the officer's warrantless entry into the rooming house did not violate Logan's rights under the Fourth Amendment because Logan had no "reasonable expectation of privacy in the area in which the officer observed the [drug] transaction." Logan contends on appeal that the trial judge erred in ruling that he

had no reasonable expectation of privacy in the hallway of the rooming house where he resided. We agree with Logan and reverse his conviction.

## I.

At the hearing on the motion to suppress, the Commonwealth's witness testified that James Logan resided in the rooming house on Jefferson Street in the City of Danville. It is a three story converted residence where approximately fifteen other people reside. The evidence proved the front door to the rooming house opens to a central hallway, which has rooms to each side and stairs leading to the upper two floors. The witness, Marilyn Adams, who is a resident of the rooming house, testified that a sign is posted on the front door that reads to the effect of "ring the door" or "knock to come in." Two other signs with the words "No trespassing" are on the front door and on a pole just before the stairs. Logan had lived there for two or three weeks prior to his arrest, and his bedroom was in the third floor attic.

One afternoon, Adams saw Logan walking on Jefferson Street toward the rooming house. Logan stopped and told her that he was looking for Joyce Searles because he had given her his bicycle and ten dollars to get him a "dime rock." Logan then walked away, searching for Searles. Adams testified that Searles later arrived on the bicycle and that she told Searles Logan was looking for her. As Adams stood inside the doorway to the rooming house, Logan arrived. He and Searles then entered the hallway and conversed. Adams saw a police vehicle stop in front of the house, and she said to Logan and Searles, "here come the police." Logan and Searles continued their conversation in the hallway and then went upstairs.

Adams testified that the police officer entered the rooming house without knocking or ringing the bell, said "good evening" to her, and went up the stairs. She said the officer later returned to the front door and asked if she knew "a James . . . [or] some other name he called." She testified that she told

the officer Logan was not that person. She recalled that the name the officer inquired about was James Chappell and said the officer did not make any inquiry about Chappell when he first entered the house.

Officer Pace testified that he saw Logan near Jefferson Street and thought Logan was James Chappell. He testified, however, that he did not know either Chappell or Logan. Officer Pace had never seen Chappell, but he had a physical description of Chappell and had information that Chappell was "supposed to be hanging around" the neighborhood. He called the dispatcher to determine whether the warrant for Chappell was still outstanding and learned that it was.

Officer Pace testified he "was going to get out of his cruiser and approach [Logan] and find out if that was, in fact, [Chappell]." Before he could do so, Logan and Searles entered the rooming house. Less than five minutes after Logan and Searles went upstairs, Officer Pace entered the rooming house and said "good evening" to Adams, who was standing in the hallway inside the front doorway. Contradicting Adams, Officer Pace testified that when he first entered the house he asked Adams "who it was and she said it was James without giving a last name."

Officer Pace testified that he entered the building without knocking or ringing the doorbell. He did not see Logan in the hallway and went upstairs. Officer Pace also testified that he had been inside the rooming house before this date. He testified he saw a sign on a lamppost that read "rooms," but did not recall seeing any other signs.

While walking upstairs, Officer Pace heard a woman say "give me my piece." He then saw Logan and Searles standing at the top of the steps on the second floor. Logan had "a large ... off white rock in his ... right hand," which he dropped into Searles' left hand. When Logan and Searles saw Officer Pace, the "rock" fell to the floor. Officer Pace retrieved it and another smaller "rock" from the floor and arrested both Logan and Searles.

The trial judge found that the transaction between Logan and Searles occurred "next to a landing on a stairway, outside the individual rooms" in the rooming house. He ruled that "Logan, a resident of one of the rooms in this structure, did not have a reasonable expectation of privacy in the area in which the officer observed the transaction." The trial judge, therefore, denied Logan's motion to suppress the evidence. At the conclusion of additional testimony from Officer Pace, the trial judge convicted Logan of possession of cocaine.

## II.

The sole issue on appeal is whether Logan "had a reasonable expectation of privacy in the stairs and hallway of the rooming house where he lived." In our review, we are bound by the trial judge's findings of historical fact unless plainly wrong or without evidence to support them. However, whether a person has an expectation of privacy within the meaning of the Fourth Amendment is a question we consider *de novo* on appeal. *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). *See also United States v. Ramapuram,* 632 F.2d 1149, 1155 (4th Cir.1980); *Sharpe v. Commonwealth,* 44 Va.App. 448, 454, 605 S.E.2d 346, 349 (2004).

The Fourth Amendment protects against unreasonable searches and seizures: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin,* 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984) (citation omitted). Thus, a warrantless entry into a person's residence is per se unreasonable unless the government can demonstrate an exigency. *Id.* It follows, therefore, as "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 587, 100

S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). " 'At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Kyllo v. United States,* 533 U.S. 27, 31, 121 S.Ct. 2038, 2041, 150 L.Ed.2d 94 (2001) (citations omitted). This is so because "the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382.

> As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, [516–17,] 19 L.Ed.2d 576 (1967). [The Court has] subsequently applied this principle to hold that a Fourth Amendment search does *not* occur—even when the explicitly protected location of a *house* is concerned—unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." [*California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986)].

*Kyllo,* 533 U.S. at 33, 121 S.Ct. at 2042–43.

■ "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois,* 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978). The Supreme Court long ago implicitly noted, however, that society would recognize a rooming house resident's expectation of privacy in his room and in the hallways of his rooming house as an area deserving the highest Fourth Amendment protection. *See McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193–94, 93 L.Ed. 153 (1948). In *McDonald,* the Supreme Court reversed a denial of a suppression motion where officers, without a warrant, climbed through the landlady's window in a rooming house and went to a hallway where they saw the defendant in

his room engaged in an unlawful activity. 335 U.S. at 452–53, 69 S.Ct. at 191–92. As Justice Jackson emphasized in his concurring opinion, "each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry." *Id.* at 458, 69 S.Ct. at 194–95 (Jackson, J., concurring).

For residents of a rooming house, the dwelling is their home. "The mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those residents." *State v. Titus,* 707 So.2d 706, 708 (Fla.1998). Thus, while a rooming house is open to its residents, unless evidence proves otherwise, a rooming house is not by its essential function open to the general public. *Id.* at 709. It follows, therefore, "as a matter of law that (1) just like private homeowners, rooming house residents have an actual expectation of privacy in the common areas of the rooming house and that (2) given the sanctity of the home society is prepared to recognize that expectation as reasonable." *Id.* at 708. The concept of home is so sacrosanct that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo,* 533 U.S. at 31, 121 S.Ct. at 2041. Applying these principles, we hold that as a resident of the rooming house, Logan undoubtedly had a legitimate privacy interest in the premises. *See also Bryant v. United States,* 599 A.2d 1107, 1109–10 (D.C.App.1991) (holding that residents of a rooming house have privacy interests in their rooms and the common areas of the rooming house); *United States v. Booth,* 455 A.2d 1351, 1353–54 (D.C.App.1983) (rejecting the government's contention that the tenant of a rooming house lacked a legitimate expectation of privacy in the front hallway of the rooming house that was open to use by all of the tenants).

Without question, there are circumstances in which a rooming house could be deemed open to the general public. *See*

*City of Evanston v. Hopkins*, 330 Ill.App. 337, 71 N.E.2d 209 (1947) (where a "Public Telephone" sign was posted at the entrance and the entrance door was open). Logan argues that no similar circumstance existed here and further argues in the alternative that the hallway of the rooming house is similar to the curtilage surrounding the home, where the expectation of privacy is diminished though still exists. We need not reach this alternative issue because the evidence in this record is devoid of any suggestion that the rooming house was open to the general public or to persons other than its residents and invited guests.

Structurally, 717 Jefferson Street was a former residence converted to a rooming house, which supports the view that these hallways were not open to the public. The hallways were interior and were shared traditional living areas within the residence. Thus, while the tenants and guests had a right to enter the common areas and hallway, the public did not. The two "No Trespassing" signs posted at the entrance declared as much, as did the sign that effectively advised visitors to ring the bell or knock to gain entry. "Merely because the residents lack total privacy within the dwelling to each have a private kitchen, and hallways within the dwelling are necessary to traverse between their bedroom and their kitchen, does not defeat the essential nature of the interior hallways or kitchen as part of their private dwelling." *Titus*, 707 So.2d at 708.

Here, the evidence proved the front entrance to the rooming house was a door and an outer storm door. The Commonwealth's witness, a resident of the rooming house, was standing in the hallway inside the front door when the officer entered. She testified that the door to the rooming house contains a "No Trespassing" sign and that on the pole before the ascending steps is a similar sign. She also testified that a sign posted on the door advises to "ring" or "knock" to enter. The officer merely testified that he did not observe those signs but did see a sign advertising "Rooms." These facts do not permit a conclusion that the rooming house was open to the general public. Indeed, at oral argument the government

concedes the rooming house was not a place open to the general public. We hold, therefore, that the hallway of Logan's rooming house was not open to the public and is to be accorded the same Fourth Amendment protection extended to the interiors of private homes.

The Commonwealth cites *United States v. Anderson*, 533 F.2d 1210 (D.C.Cir.1976), as authority that a dweller of a rooming house has no reasonable expectation of privacy in the hallways. In *Anderson*, the appellant contended no exigent circumstances justified the warrantless entry to his room. The court did not reach that issue but summarily held as follows:

> When the police officers entered the rooming house they did not enter appellant's private dwelling; instead they merely entered the common corridors of the building, which were available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises. Consequently, insofar as appellant maintains that he had a constitutionally protected reasonable expectation of privacy in the corridors of the rooming house, we disagree; appellant's constitutionally protected privacy interest began at the door to room eight rather than at the door to the entire rooming house.

*Id.* at 1214.

We believe this reasoning is unpersuasive. It states, in conclusory fashion, that police "did not enter appellant's private dwelling," then fails to recognize that delivery persons and others with legitimate reason for being on the premises must have permission before entering and that their occasional presence does not defeat a resident's expectation of privacy.

The Commonwealth also argues by analogy that hallways in a rooming house are similar to apartment hallways, where some courts have held there is no reasonable expectation of privacy. *See e.g. United States v. Nohara*, 3 F.3d 1239, 1241 (9th Cir.1993) (no reasonable expectation of privacy in common hallways of apartment building); *United States v. Holland*, 755 F.2d 253, 255–56 (2d Cir.1985) (same); *United*

*States v. Concepcion,* 942 F.2d 1170, 1172 (7th Cir.1991) (same); *United States v. Eisler,* 567 F.2d 814, 816 (8th Cir. 1977) (same); *but see United States v. Carriger,* 541 F.2d 545, 551 (6th Cir.1976) (holding residents have reasonable expectations of privacy in apartment hallways). We find the reasoning in the Commonwealth's arguments unpersuasive because a significant difference exists between hallways in an apartment building and those in rooming houses.

> [C]ommon hallways in unlocked apartment buildings, ... generally serve only to connect separate, self-contained living units typically complete with all of the traditional living areas (i.e., bathrooms, dining rooms, living rooms, kitchens, etc.). Interior hallways in rooming houses are protected only by virtue of linking such traditional rooms within the house—they provide rooming house residents with the only means of access to these rooms, and are an inseparable feature of their "home." In other words, it is not any inherent nature of a hallway that controls, but rather what the hallway links (i.e., individual self-contained living units versus shared traditional living areas).

*Titus,* 707 So.2d at 711.

It is not likely this issue would be seriously debated if the circumstances involved several families or individuals renting a vacation home and the issue was whether police officers could enter the shared kitchen, hallways, or bathrooms without invading the dweller's privacy.

> The privacy interests here sought to be vindicated might well be analogized to the common practice among middle income persons of renting a "group home" for the summer or winter, in which each person or couple occupies a bedroom, but shares kitchen and bathroom facilities. Although privacy in common areas is thereby relinquished to some extent with respect to the other residents, it could not be seriously contended that the police are thereby permitted to enter such premises without announcing their authority, and to roam freely therein with guns drawn, without a warrant

or exigent circumstances, neither of which was established here.

*People v. Garriga*, 189 A.D.2d 236, 596 N.Y.S.2d 25, 29 (1993).

Logan's residence was not a vacation home, but the regular dwelling for fifteen people. The rooming house "was not a hotel, restaurant, or public place where the public was invited or had the right to come and go at will." *Brown v. United States*, 83 F.2d 383, 385 (3d Cir.1936). The rooming house was Logan's home "and so far as the unlawful entry and search affected him, it violated his constitutional rights." *Id.* at 386. We hold that the common areas of the rooming house were part of Logan's "home" within the meaning of the Fourth Amendment.

## III.

Citing *Hill v. California*, 401 U.S. 797, 804, 91 S.Ct. 1106, 1111, 28 L.Ed.2d 484 (1971), and *Shears v. Commonwealth*, 23 Va.App. 394, 399, 477 S.E.2d 309, 311 (1996), the Commonwealth contends that even if Logan had a reasonable expectation of privacy within those common areas, the officer was justified in entering the dwelling, because he reasonably but mistakenly relied on the authority of an existing warrant to arrest James Chappell, whom he suspected Logan to be. Logan contends the Commonwealth failed to prove the officer acted reasonably or in good faith.

Logan averred in his brief in support of his motion to suppress that 717 Jefferson Street, the rooming house, was his home and that the officer made a warrantless entry into the home without a search warrant and without an arrest warrant for him. Indeed, the Commonwealth's own evidence proved it was Logan's residence and the officer did not have a warrant to arrest Logan. Fourth Amendment principles dictate that "an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection." *Payton*, 445 U.S. at 588, 100 S.Ct. at 1381. Thus, warrantless entries and searches " 'are subject

only to a few specifically established and well-delineated exceptions ...[, which] are jealously and carefully drawn and [require a] showing by those who seek exemption that the exigencies of the situation made that course imperative.'" *Florida v. White*, 526 U.S. 559, 568, 119 S.Ct. 1555, 1561, 143 L.Ed.2d 748 (1999) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971)).

The police officer had neither an arrest warrant for Logan nor a search warrant for the residence. He testified that when he saw Logan on the street he "thought [Logan] was an individual by the name of James Chappell." The officer testified, however, he had not previously met either Logan or Chappell. The only objective facts that he relates to support his belief are that Chappell "was approximately five foot, seven inches tall," weighed about two hundred pounds, and was a black male. Yet, he learned after the arrest that Chappell "had a little more weight on him than Logan." The officer also had information that Chappell "was supposed to be hanging around" the neighborhood. This general information would not lead a reasonable person to conclude that Logan was Chappell. Indeed, by Officer Pace's own testimony, he had intended to ask Logan his identity when he saw him on the street.

Adams testified the officer asked her if she knew James Chappell. She said she told him that Logan was not that person. The officer testified he "asked [Adams] who it was and she said it was James." He did not testify that he used a surname when he made his inquiry or inquired further when Adams merely said the man was James. In either event, these circumstances demonstrate that the officer's conclusion that Logan was Chappell was merely a hunch or suspicion.

Assuming Officer Pace subjectively believed Logan was Chappell, the evidence did not prove his belief was objectively reasonable. The Supreme Court and this Court have held that a mistaken arrest was reasonable when the arrest was based on specific, detailed information as to the time and place where the arrestee would be found. *Hill*, 401 U.S. at 803, 91

S.Ct. at 1110; *Shears,* 23 Va.App. at 399–400, 477 S.E.2d at 311. In *Hill,* one of two arrested drug dealers implicated Hill in a robbery and told police officers he was "currently" sharing an apartment with Hill at 9311 Sepulveda Boulevard in Los Angeles. 401 U.S. at 798, 91 S.Ct. at 1108. This information was timely and specifically named the place where police could locate Hill. The police officer then used official records to verify Hill's "prior association with [the arrested drug dealer], his age and physical description, his address, and the make of his car." *Id.* at 799, 91 S.Ct. at 1108. All of this information "corresponded with the general description by the robbery victims and the statements made by [the arrested informants]." *Id.* When police went to Hill's apartment, Hill's name was on the mailbox and a man who closely matched Hill's description answered the door. *Id.* These facts connected the two men both by description and location. Thus, the facts supported the conclusion "that the arresting officers had a reasonable, good faith belief that the arrestee Miller was in fact Hill." *Id.* at 802, 91 S.Ct. at 1110 (noting that " '[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest' ").

The details of description and place that made the mistaken arrest reasonable in *Shears* were similar.

It is uncontroverted that the detectives were vested with the authority of the warrant for Boyce when defendant was arrested at the informant's trailer. The informer was instructed to telephone Boyce, an individual known to police as a drug dealer reputed for quick response to solicitations. Within minutes after the informer advised the detectives that he had contacted Boyce as directed, defendant arrived and entered the trailer. The detectives had previously seen neither defendant nor Boyce, but defendant's appearance was consistent with Boyce's "general description," and his comments were suggestive of an impending narcotics transaction. Under such circumstances, the police clearly acted

both in good faith and reasonably in arresting defendant, as Boyce, albeit in error.

*Shears,* 23 Va.App. at 399–400, 477 S.E.2d at 311.

By Officer Pace's own admission, he had never seen either Logan or Chappell and had only a general description of Chappell. Additionally, no information linked Chappell to the residence. When the officer asked the woman at the door who the man was that entered, he received no indication that it was Chappell. Even if the woman's response could be deemed ambiguous, the officer made no further inquiry. Thus, the officer's testimony raised doubt whether he even believed that he was following Chappell. The details and information that made the mistake reasonable in *Hill* and *Shears* were missing here. Officer Pace was acting on a two-month-old warrant and information that Chappell was "hanging out" in the neighborhood. The details as to a specific place were lacking, as was the accuracy of the description. The officer did not testify that Logan is about the same height as Chappell. He testified that Chappell weighed 200 pounds and was heavier than Logan. We cannot say under these facts that Officer Pace's mistaking Logan for Chappell was objectively reasonable.

For the aforementioned reasons, we reverse the trial judge's denial of Logan's motion to suppress.

*Reversed.*

HALEY, J., dissenting.

I.

I respectfully dissent.

It is fundamental that an individual may only assert a Fourth Amendment violation if he has "a reasonable expectation of privacy" in the place searched or location where he is arrested. *Rakas v. Illinois,* 439 U.S. 128, 130, 99 S.Ct. 421, 423, 58 L.Ed.2d 387 (1978); *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *Delong v. Commonwealth,* 234 Va. 357, 363, 362 S.E.2d 669, 672 (1987),

*cert. denied,* 485 U.S. 929, 108 S.Ct. 1100, 99 L.Ed.2d 263 (1988); *Hardy v. Commonwealth,* 17 Va.App. 677, 680, 440 S.E.2d 434, 436 (1994).[1]

It is likewise established that in support of a motion to suppress, the defendant has the burden of proving he had a reasonable expectation of privacy in the place searched or the location where he is arrested. *Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Barnes v. Commonwealth,* 234 Va. 130, 135, 360 S.E.2d 196, 200 (1987); *Sharpe v. Commonwealth,* 44 Va.App. 448, 455, 605 S.E.2d 346, 349 (2004). "[I]n order to claim the protection of the Fourth Amendment, *a defendant must demonstrate* that he personally has an expectation of privacy in the place searched...." *Minnesota v. Carter,* 525 U.S. 83, 88, 119 S.Ct. 469, 472, 142 L.Ed.2d 373 (1998) (emphasis added).

Succinctly stated, the establishment of a reasonable expectation of privacy is a condition precedent to asserting the protection of the Fourth Amendment, and the defendant has the *burden of production,* the burden of presenting evidence supporting that expectation.

## II.

With respect to the motion to suppress in the instant case, only two witnesses testified, Marilyn Elizabeth Adams and Officer Jerry Pace. Ms. Adams was a resident in the rooming house, in room one on the first floor. She testified the rooming house had three floors, with "about" fifteen tenants, was owned by a James Gunn, and appellant lived "all way upstairs in the attic."[2]  Upon being asked how long appellant

---

1. In Fourth Amendment jurisprudence, for analytical purposes, the establishment of "a reasonable expectation of privacy" has replaced the classic concept of asserting "standing." *See Minnesota v. Carter,* 525 U.S. 83, 85, 119 S.Ct. 469, 471, 142 L.Ed.2d 373 (1998); *Rakas,* 439 U.S. at 139–40, 99 S.Ct. at 428.

2. Presumably, appellant did have a reasonable expectation of privacy "in the attic," if that in fact was his personal residence. "[T]he occupant of a room in a boarding house ... is entitled to constitutional

had lived in the rooming house, she replied: "I'm not sure . . . about two or three weeks." She testified that there was a "No trespassing" sign and a sign which said either "knock" or "ring" for entry, both of which were posted on the glass in the front door. At the time appellant and a Joyce Searles entered the rooming house, and when Officer Pace followed less than "five minutes" later, Ms. Adams testified she was "standing in the [open front] doorway." She knew that Joyce Searles was not a resident of the rooming house and had entered with appellant to consummate a drug transaction. She testified that Officer Pace passed by her in the open doorway, saying only "good evening," and that she said nothing to him.

Officer Pace testified he thought appellant was one Chappell, for whom there were outstanding arrest warrants. He did not see either the "No trespassing" or "ring" (or knock) to enter signs, presumably because they were posted on the glass of the front door, which he testified, in accordance with Ms. Adams, was "standing open." He did testify, however, that there was "a sign hanging on like a lamp post or something out front that says 'Rooms.'" He testified he knew the building was a rooming house and had been inside before. After entering the front door, there was a central hallway, with rooms on each side, which led to a stairway. Officer Pace said he walked down the hallway, rounded a bend in the stairway leading to the second floor, and saw appellant and Searles standing above him on the second floor stairway landing. It was at this location that Officer Pace saw the appellant holding, and then dropping, the "rock" of cocaine.

Thus, the issue in the motion to suppress was whether appellant had met his burden of production, of producing

protection against unreasonable searches and seizures." *Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). This Court had likewise affirmed such an expectation with respect to motel rooms. *See McCary v. Commonwealth,* 36 Va.App. 27, 36, 548 S.E.2d 239, 243–44 (2001); *Jones v. Commonwealth,* 16 Va.App. 725, 727, 432 S.E.2d 517, 518 (1993); *Servis v. Commonwealth,* 6 Va.App. 507, 514, 371 S.E.2d 156, 159 (1988).

evidence to show he had "a reasonable expectation of privacy" on the second floor stairway landing. I submit he did not.

## III.

The majority cites *State v. Titus*, 707 So.2d 706 (Fla.1998), for the proposition that a resident can have a reasonable expectation of privacy in a rooming house. That case was an appeal from a decision of the Court of Appeals of Florida, Fourth District, reported as *Titus v. State*, 696 So.2d 1257 (1997). It is clear from that decision that the defendant produced evidence in his motion to suppress supporting a conclusion that he in fact had a reasonable expectation of privacy in a rooming house common kitchen. "The residents testified that the house is, effectually, private for the tenants and their guests, and that the kitchen is available for use only by the tenants. In fact, some of the tenants store personal belongings in the kitchen." *Id.* at 1258.

The majority also cites *Bryant v. United States*, 599 A.2d 1107 (D.C.App.1991). Again, however, the court noted:

The evidence shows that 4621 Georgia Avenue was not obviously a rooming house open to the public.... [T]he 4600 block of Georgia Avenue had private homes, not apartment buildings.... At the suppression hearing Sergeant McGuire explained that "once inside the house, it *turned out to be* a rooming house" ... [and there was] ... proof of appellant's "authority to exclude others from the area entered and searched...." Appellant testified that the tenants shared the use of the kitchen, and nothing in the record suggests that the residents had relinquished their authority to exclude uninvited persons from the kitchen and adjoining areas.

599 A.2d at 1109–10.

Likewise, in citing *United States v. Booth*, 455 A.2d 1351 (D.C.App.1983), the majority does not address the evidence adduced by the defendant.

[T]he rooming house ... and thus its front hallway—was not open to the general public. Indeed, we note that Officer

Terrell, upon his arrival, did not even perceive that 1620 Swann Street, N.W. was a rooming house. Thus, if a stranger appeared at the front door, appellees, as residents, had authority, and were in a position, to deny entry.

455 A.2d at 1354.

## IV.

Momentarily setting aside the question of the burden of production of evidence supportive of a reasonable expectation of privacy in the hallways or stairwells of an apartment or rooming house, it should be noted that a number of courts have held that as a matter of law, there can be no such expectation in such areas.

In *United States v. Anderson,* 533 F.2d 1210, 1214 (D.C.Cir. 1976), the Federal Court of Appeals, as quoted by the majority, held:

"When the police officers entered the rooming house they did not enter appellant's private dwelling; instead they merely entered the common corridors of the building, which were available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises. Consequently, insofar as appellant maintains that he had a constitutionally protected reasonable expectation of privacy in the corridors of the rooming house, we disagree; appellant's constitutionally protected privacy interest began at the door to room eight rather than at the door to the entire rooming house."

The majority of federal courts have reached that conclusion. *See United States v. Nohara,* 3 F.3d 1239, 1241 (9th Cir.1993) ("we conclude that any expectation Nohara might have had [in an apartment hallway] is not one that society recognizes as reasonable"); *United States v. Barros–Moriera,* 872 F.2d 12, 14 (2d Cir.1989), *cert. denied,* 493 U.S. 953, 110 S.Ct. 364, 107 L.Ed.2d 350 (1989) ("Here the police entry was into a common [apartment] hallway, an area where there is no legitimate expectation of privacy ... even though the area was guarded by a locked door."); *United States v. Concepcion,* 942 F.2d

1170, 1172 (7th Cir.1991) (apartment common areas); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir.1977) (apartment hallway); *United States v. Cruz Pagan*, 537 F.2d 554, 558 (1st Cir.1976) (apartment garage).

## V.

In *McCoy v. Commonwealth*, 2 Va.App. 309, 312, 343 S.E.2d 383, 385 (1986), this Court held that the defendant visiting in an apartment did not therein have such a reasonable expectation of privacy, noting, *inter alia*, that "the *evidence* ... failed to show ... [that appellant possessed] ... a right to exclude others from the premises...." (Emphasis added). The Court recognized that it was the defendant's burden to produce evidence supportive of his claim of a reasonable expectation of privacy.

In the instant case, as summarized above, the uncontradicted evidence shows that (1) the door to the rooming house was open, thereby presumably hiding a view of any signs posted upon it, and concomitantly permitting entry by anyone; (2) a sign posted outside the front of the rooming house read "Rooms"; any reasonable inference from that sign must include the proposition that it was an invitation to enter and inquire as to the availability of a room to let, and an invitation open to the public; (3) Ms. Adams claimed no ownership or managerial or residential authority to exclude, or not exclude, anyone from the rooming house, and said nothing to Officer Pace as he entered; and (4) Officer Pace knew the building was a rooming house when he entered, having previously been to the location. That being said, there is no evidence whatsoever as to any rules or agreements or practices, from any source, such as the owner or manager or residents, with respect to whom, or under what conditions, one could enter, or not enter, the rooming house and its common areas. Finally, the appellant offered no evidence "that he *personally* [had] an expectation of privacy" in the second story stairwell landing. *Carter*, 525 U.S. at 88, 119 S.Ct. at 472 (emphasis added).

## VI.

In *Sharpe,* 44 Va.App. at 454, 605 S.E.2d at 349, this Court stated:

On appeal of a ruling on a motion to suppress, we view the evidence in the light most favorable to the prevailing party, here the Commonwealth, granting to the evidence all reasonable inferences deducible therefrom. *Commonwealth v. Grimstead,* 12 Va.App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them," *McGee v. Commonwealth,* 25 Va.App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc), but we review *de novo* the trial court's application of defined legal standards such as whether a defendant had a reasonable expectation of privacy sufficient to permit him to raise a Fourth Amendment challenge to a search, *United States v. Gordon,* 168 F.3d 1222, 1225 (10th Cir.1999).

Applying that standard, I would hold the appellant failed to produce evidence sufficient to prove that he had a reasonable expectation of privacy in the second floor stairwell landing of the rooming house. I would affirm the ruling of the trial court denying the motion to suppress and, accordingly, the conviction of the appellant.