COURT OF APPEALS OF VIRGINIA


Before:  Chief Judge Fitzpatrick, Judges Benton, Elder, Bumgardner, Frank, Humphreys,
         Clements, Felton, Kelsey, McClanahan and Haley
Argued at Richmond, Virginia


JAMES GREGORY LOGAN

                                                            OPINION BY
v.      Record No. 0852-04-3                     JUDGE D. ARTHUR KELSEY
                                                         DECEMBER 13, 2005

COMMONWEALTH OF VIRGINIA


                         UPON REHEARING EN BANC

             FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
                          Joseph W. Milam, Jr., Judge

        S. Jane Chittom, Appellate Defender (Virginia Indigent Defense
        Commission, on brief), for appellant.

        Donald E. Jeffrey, III, Assistant Attorney General (Judith Williams
        Jagdmann, Attorney General, on briefs), for appellee.


        Convicted of possession of cocaine, James Gregory Logan argues on appeal that the trial

court erred by not suppressing evidence obtained during a warrantless entry into Logan's

rooming house.  We agree with Logan and reverse his conviction.

                                          I.

        Looking for someone else, a police officer entered the rooming house where Logan

resided.  The rooming house was an old home converted to board fifteen residents.  The officer

had no arrest warrant for Logan or any search warrant for the rooming house.  Once inside, the

officer saw Logan walking up a flight of steps to his room on the third floor.  Unaware that the

officer was observing him, Logan handed a piece of crack cocaine to another person.  The officer

then arrested Logan for possession of cocaine.

The evidence at the suppression hearing was in conflict on the extent to which the rooming house was open to the general public. The officer suggested it was, but another resident testified that two no-trespassing signs were posted on or near the front door, suggesting only residents and invited guests could enter the rooming house. The trial court denied the motion to suppress, holding that the officer did not violate the Fourth Amendment by entering the rooming house without a warrant.

On appeal, the Commonwealth conceded to a panel of this Court that the rooming house was not open to the general public. The panel relied on this concession and, coupled with additional reasoning, held that Logan possessed a reasonable expectation of privacy in the interior common areas of the rooming house. Logan v. Commonwealth, 46 Va. App. 213, 222-23, 616 S.E.2d 744, 748 (2005) (observing that "at oral argument the government concedes the rooming house was not a place open to the general public").[1] At the Commonwealth's request, we agreed to set aside our panel opinion and to reconsider the matter *en banc*.

II.

Though the ultimate question whether a reasonable expectation of privacy exists in a rooming house involves an issue of law, we address that question only after the relevant historical facts have been established. In this case, the Commonwealth conceded that Logan's rooming house — a private home converted to board fifteen residents — was *not* open to the general public.[2] It naturally follows, as a matter of law, that residents of this rooming house

---

[1] The panel also rejected the Commonwealth's alternative argument that the officer reasonably, but mistakenly, believed Logan was another man wanted by police on a pending arrest warrant. During our *en banc* hearing, the Commonwealth expressly withdrew this argument as a basis for affirming the trial court's judgment. We thus express no opinion on this subject.

[2] The defendant alone bears the "burden of proving" factual circumstances giving rise to a reasonable expectation of privacy. Sharpe v. Commonwealth, 44 Va. App. 448, 455, 605 S.E.2d 346, 349 (2004); see also Bell v. Commonwealth, 264 Va. 172, 190, 563 S.E.2d 695, 708

would have a reasonable expectation of privacy in the interior common areas that had been placed off-limits to the general public — areas thereby reserved for the private use of the rooming house residents and their invited guests. This conclusion remains true whether we take a broad view of the privacy interests associated with rooming houses, as Logan urges us to do, see, e.g., State v. Titus, 707 So. 2d 706, 709 (Fla. 1998) (holding that a resident of a rooming house has a privacy interest in common areas not "open to the general public"), or a more narrow approach, as the Commonwealth contends we should, see, e.g., United States v. Anderson, 533 F.2d 1210, 1214 (D.C. Cir. 1976) (refusing to recognize a privacy interest in a rooming house open to anyone with a "legitimate reason to be on the premises"). For purposes of this appeal, we need not endorse or reject either view. [3] See generally 1 Wayne R. LaFave, Search & Seizure § 2.3(b), at 569-70 (4th ed. 2004).

The Commonwealth argues we should not decide this case based upon the concession, but should instead make an independent judgment on this subject. Our duty of exercising *de novo* judgment, however, plays no role in determining the contested facts of a case. Those are for the litigants to develop and the factfinder to decide. We review *de novo* only the "ultimate question" whether the officer violated the Fourth Amendment. Kyer v. Commonwealth, 45

---

(2002). This is not a mere burden of production, requiring only a going forward with the evidence; it is a "burden of persuasion," United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994), requiring the defendant to prove to the satisfaction of the factfinder the existence of those facts upon which a legal conclusion can be drawn.

[3] To go further than the Commonwealth's concession, we believe, "would conflict with two principles of judicial self-restraint: our reluctance to issue what amounts to an 'advisory opinion' on an inessential subject, Craddock v. Commonwealth, 40 Va. App. 539, 551 n.1, 580 S.E.2d 454, 461 n.1 (2003), and our corresponding desire to decide the case 'on the best and narrowest ground available.' Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 531 (1991) (Stevens, J., concurring)." Johnson v. Commonwealth, 45 Va. App. 113, 117 n.3, 609 S.E.2d 58, 60 n.3 (2005).

Va. App. 473, 479, 612 S.E.2d 213, 216-17 (2005) (*en banc*); Slayton v. Commonwealth, 41

Va. App. 101, 105, 582 S.E.2d 448, 449-50 (2003).

Our fidelity to the uniform application of law precludes us from accepting concessions of law made on appeal. Because the law applies to all alike, it cannot be subordinated to the private opinions of litigants.[4] An entirely different paradigm, however, applies to questions of fact unique to the litigants and specific to the circumstances of each particular case. Thus the maxim: "A party can concede the facts but cannot concede the law." Cofield v. Nuckles, 239 Va. 186, 194, 387 S.E.2d 493, 498 (1990); see also Tuggle v. Commonwealth, 230 Va. 99, 111 n.5, 334 S.E.2d 838, 846 n.5 (1985). On purely factual questions, therefore, we can and do rely on the adversarial process to sort out the contested and the uncontested aspects of the case before we begin our responsibility of applying *de novo* the correct legal principles.

III.

By making a warrantless entry into Logan's rooming house, the police officer violated the Fourth Amendment. Thus, the officer's observations once inside the house cannot be used against Logan. There being no other inculpatory evidence supporting the charge, we reverse Logan's conviction and dismiss the indictment for possession of cocaine.

Reversed and indictment dismissed.

---

[4] For similar reasons, an "appellate court cannot vacate a criminal conviction that violates no recognizable legal principle simply on the ground that the prosecutor (or, for that matter, the trial judge) did not articulate the proper legal basis for it." Blackman v. Commonwealth, 45 Va. App. 633, 642, 613 S.E.2d 460, 465 (2005). This principle must be distinguished, however, from an appellant's concession of law that qualifies either as a waiver for purposes of Rule 5A:18 or as an express withdrawal of an appellate challenge to a trial court judgment. In either scenario, we may accept the concession — not as a basis for deciding the contested issue of law, but as a basis for not deciding it.

Benton and Elder, JJ., concurring in the judgment reversing the conviction.

For the reasons contained in the majority panel opinion, <u>Logan v. Commonwealth</u>, 46 Va. App. 213, 616 S.E.2d 744 (2005), we would reverse the conviction and dismiss the indictment. We, therefore, concur in the judgment reversing the conviction and dismissing the indictment.

**VIRGINIA:**     C O R R E C T E D   C O P Y

*In the Court of Appeals of Virginia on*  **Tuesday**  *the*  **30th**  *day of*  **August, 2005**.

James Gregory Logan,                                                                 Appellant,

 against          Record No. 0852-04-3
                  Circuit Court No. CR03-1637

Commonwealth of Virginia,                                                            Appellee.

Upon a Petition for Rehearing En Banc

Before the Full Court

On August 16, 2005 came the appellee, by the Attorney General of Virginia, and filed a petition

praying that the Court set aside the judgment rendered herein on August 2, 2005, and grant a rehearing

*en banc* thereof.

On consideration whereof, the petition for rehearing *en banc* is granted, the mandate entered

herein on August 2, 2005 is stayed pending the decision of the Court *en banc*, and the appeal is

reinstated on the docket of this Court.

The parties shall file briefs in compliance with Rule 5A:35. The appellee shall attach as an

addendum to the opening brief upon rehearing *en banc* a copy of the opinion previously rendered by the

Court in this matter.  It is further ordered that the appellee shall file with the clerk of this Court twelve

additional copies of the appendix previously filed in this case.


A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

Present: Judges Benton, Elder and Haley
Argued at Salem, Virginia


JAMES GREGORY LOGAN

v.      Record No. 0852-04-3

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE JAMES W. BENTON, JR.
AUGUST 2, 2005


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
Joseph W. Milam, Jr., Judge

S. Jane Chittom, Appellate Defender (Virginia Indigent Defense
Commission, on briefs), for appellant.

Margaret W. Reed, Assistant Attorney General (Jerry W. Kilgore,
Attorney General, on brief), for appellee.


A police officer entered the rooming house where James Gregory Logan resided, saw Logan

in possession of cocaine on the second floor, and arrested Logan. At a hearing on a motion to

suppress the cocaine, the trial judge ruled that the officer's warrantless entry into the rooming house

did not violate Logan's rights under the Fourth Amendment because Logan had no "reasonable

expectation of privacy in the area in which the officer observed the [drug] transaction." Logan

contends on appeal that the trial judge erred in ruling that he had no reasonable expectation of

privacy in the hallway of the rooming house where he resided. We agree with Logan and reverse

his conviction.

I.

At the hearing on the motion to suppress, the Commonwealth's witness testified that James

Logan resided in the rooming house on Jefferson Street in the City of Danville. It is a three story

converted residence where approximately fifteen other people reside. The evidence proved the front

door to the rooming house opens to a central hallway, which has rooms to each side and stairs leading to the upper two floors.  The witness, Marilyn Adams, who is a resident of the rooming house, testified that a sign is posted on the front door that reads to the effect of "ring the door" or "knock to come in."  Two other signs with the words "No trespassing" are on the front door and on a pole just before the stairs.  Logan had lived there for two or three weeks prior to his arrest, and his bedroom was in the third floor attic.

One afternoon, Adams saw Logan walking on Jefferson Street toward the rooming house. Logan stopped and told her that he was looking for Joyce Searles because he had given her his bicycle and ten dollars to get him a "dime rock."  Logan then walked away, searching for Searles. Adams testified that Searles later arrived on the bicycle and that she told Searles Logan was looking for her.  As Adams stood inside the doorway to the rooming house, Logan arrived.  He and Searles then entered the hallway and conversed.  Adams saw a police vehicle stop in front of the house, and she said to Logan and Searles, "here come the police."  Logan and Searles continued their conversation in the hallway and then went upstairs.

Adams testified that the police officer entered the rooming house without knocking or ringing the bell, said "good evening" to her, and went up the stairs.  She said the officer later returned to the front door and asked if she knew "a James . . . [or] some other name he called."  She testified that she told the officer Logan was not that person.  She recalled that the name the officer inquired about was James Chappell and said the officer did not make any inquiry about Chappell when he first entered the house.

Officer Pace testified that he saw Logan near Jefferson Street and thought Logan was James Chappell.  He testified, however, that he did not know either Chappell or Logan.  Officer Pace had never seen Chappell, but he had a physical description of Chappell and had information that

Chappell was "supposed to be hanging around" the neighborhood. He called the dispatcher to determine whether the warrant for Chappell was still outstanding and learned that it was.

Officer Pace testified he "was going to get out of his cruiser and approach [Logan] and find out if that was, in fact, [Chappell]." Before he could do so, Logan and Searles entered the rooming house. Less than five minutes after Logan and Searles went upstairs, Officer Pace entered the rooming house and said "good evening" to Adams, who was standing in the hallway inside the front doorway. Contradicting Adams, Officer Pace testified that when he first entered the house he asked Adams "who it was and she said it was James without giving a last name."

Officer Pace testified that he entered the building without knocking or ringing the doorbell. He did not see Logan in the hallway and went upstairs. Officer Pace also testified that he had been inside the rooming house before this date. He testified he saw a sign on a lamppost that read "rooms," but did not recall seeing any other signs.

While walking upstairs, Officer Pace heard a woman say "give me my piece." He then saw Logan and Searles standing at the top of the steps on the second floor. Logan had "a large . . . off white rock in his . . . right hand," which he dropped into Searles' left hand. When Logan and Searles saw Officer Pace, the "rock" fell to the floor. Officer Pace retrieved it and another smaller "rock" from the floor and arrested both Logan and Searles.

The trial judge found that the transaction between Logan and Searles occurred "next to a landing on a stairway, outside the individual rooms" in the rooming house. He ruled that "Logan, a resident of one of the rooms in this structure, did not have a reasonable expectation of privacy in the area in which the officer observed the transaction." The trial judge, therefore, denied Logan's motion to suppress the evidence. At the conclusion of additional testimony from Officer Pace, the trial judge convicted Logan of possession of cocaine.

II.

The sole issue on appeal is whether Logan "had a reasonable expectation of privacy in the stairs and hallway of the rooming house where he lived."  In our review, we are bound by the trial judge's findings of historical fact unless plainly wrong or without evidence to support them.  However, whether a person has an expectation of privacy within the meaning of the Fourth Amendment is a question we consider *de novo* on appeal.  Minnesota v. Olsen, 495 U.S. 91 (1990).  See also United States v. Ramapuram, 632 F.2d 1149, 1155 (4th Cir. 1980); Sharpe v. Commonwealth, 44 Va. App. 448, 454, 605 S.E.2d 346, 349 (2004).

The Fourth Amendment protects against unreasonable searches and seizures:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'"  Welsh v. Wisconsin, 466 U.S. 740, 748 (1984) (citation omitted).  Thus, a warrantless entry into a person's residence is per se unreasonable unless the government can demonstrate an exigency.  Id.  It follows, therefore, as "a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable."  Payton v. New York, 445 U.S. 573, 587 (1980).  "'At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  Kyllo v. United States, 533 U.S. 27, 31 (2001) (citations omitted).  This is so because "the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  Payton, 445 U.S. at 590.

> As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.  See Katz v. United States, 389 U.S. 347, 361 (1967).

- 4 -

> [The Court has] subsequently applied this principle to hold that a Fourth Amendment search does *not* occur -- even when the explicitly protected location of a *house* is concerned -- unless "the individual manifested a subjective expectation of privacy in the object of the challenged search," and "society [is] willing to recognize that expectation as reasonable." [California v. Ciraolo, 476 U.S. 207, 211 (1986)]."

Kyllo, 533 U.S. at 33.

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 131 n.1 (1978). The Supreme Court long ago implicitly noted, however, that society would recognize a rooming house resident's expectation of privacy in his room and in the hallways of his rooming house as an area deserving the highest Fourth Amendment protection. See McDonald v. United States, 335 U.S. 451, 456 (1948). In McDonald, the Supreme Court reversed a denial of a suppression motion where officers, without a warrant, climbed through the landlady's window in a rooming house and went to a hallway where they saw the defendant in his room engaged in an unlawful activity. 335 U.S. at 452-53. As Justice Jackson emphasized in his concurring opinion, "each tenant of a building, while he has no right to exclude from the common hallways those who enter lawfully, does have a personal and constitutionally protected interest in the integrity and security of the entire building against unlawful breaking and entry." Id. at 458 (Jackson, J., concurring).

For residents of a rooming house, the dwelling is their home. "The mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those residents." State v. Titus, 707 So. 2d 706, 708 (Fla. 1998). Thus, while a rooming house is open to its residents, unless evidence proves otherwise, a rooming house is not by its essential function open to the general public. Id. at 709. It follows, therefore, "as a matter of law that (1) just like private homeowners, rooming house residents

have an actual expectation of privacy in the common areas of the rooming house and that (2) given the sanctity of the home society is prepared to recognize that expectation as reasonable." Id. at 708. The concept of home is so sacrosanct that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." Kyllo, 533 U.S. at 31. Applying these principles, we hold that as a resident of the rooming house, Logan undoubtedly had a legitimate privacy interest in the premises. See also Bryant v. United States, 599 A.2d 1107, 1109-10 (D.C. App. 1991) (holding that residents of a rooming house have privacy interests in their rooms and the common areas of the rooming house); United States v. Booth, 455 A.2d 1351, 1353-54 (D.C. App. 1983) (rejecting the government's contention that the tenant of a rooming house lacked a legitimate expectation of privacy in the front hallway of the rooming house that was open to use by all of the tenants).

Without question, there are circumstances in which a rooming house could be deemed open to the general public. See City of Evanston v. Hopkins, 71 N.E.2d 209 (Ill. App. Ct. 1947) (where a "Public Telephone" sign was posted at the entrance and the entrance door was open). Logan argues that no similar circumstance existed here and further argues in the alternative that the hallway of the rooming house is similar to the curtilage surrounding the home, where the expectation of privacy is diminished though still exists. We need not reach this alternative issue because the evidence in this record is devoid of any suggestion that the rooming house was open to the general public or to persons other than its residents and invited guests.

Structurally, 717 Jefferson Street was a former residence converted to a rooming house, which supports the view that these hallways were not open to the public. The hallways were interior and were shared traditional living areas within the residence. Thus, while the tenants and guests had a right to enter the common areas and hallway, the public did not. The two "No Trespassing" signs posted at the entrance declared as much, as did the sign that effectively

- 6 -

advised visitors to ring the bell or knock to gain entry. "Merely because the residents lack total privacy within the dwelling to each have a private kitchen, and hallways within the dwelling are necessary to traverse between their bedroom and their kitchen, does not defeat the essential nature of the interior hallways or kitchen as part of their private dwelling." Titus, 707 So. 2d at 708.

Here, the evidence proved the front entrance to the rooming house was a door and an outer storm door. The Commonwealth's witness, a resident of the rooming house, was standing in the hallway inside the front door when the officer entered. She testified that the door to the rooming house contains a "No Trespassing" sign and that on the pole before the ascending steps is a similar sign. She also testified that a sign posted on the door advises to "ring" or "knock" to enter. The officer merely testified that he did not observe those signs but did see a sign advertising "Rooms." These facts do not permit a conclusion that the rooming house was open to the general public. Indeed, at oral argument the government concedes the rooming house was not a place open to the general public. We hold, therefore, that the hallway of Logan's rooming house was not open to the public and is to be accorded the same Fourth Amendment protection extended to the interiors of private homes.

The Commonwealth cites United States v. Anderson, 533 F.2d 1210 (D.C. Cir. 1976), as authority that a dweller of a rooming house has no reasonable expectation of privacy in the hallways. In Anderson, the appellant contended no exigent circumstances justified the warrantless entry to his room. The court did not reach that issue but summarily held as follows:

> When the police officers entered the rooming house they did not enter appellant's private dwelling; instead they merely entered the common corridors of the building, which were available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises. Consequently, insofar as appellant maintains that he had a constitutionally protected reasonable expectation of privacy in the corridors of the rooming house, we disagree; appellant's

> constitutionally protected privacy interest began at the door to
> room eight rather than at the door to the entire rooming house.

Id. at 1214.

We believe this reasoning is unpersuasive. It states, in conclusory fashion, that police "did not enter appellant's private dwelling," then fails to recognize that delivery persons and others with legitimate reason for being on the premises must have permission before entering and that their occasional presence does not defeat a resident's expectation of privacy.

The Commonwealth also argues by analogy that hallways in a rooming house are similar to apartment hallways, where some courts have held there is no reasonable expectation of privacy. See e.g. United States v. Nohara, 3 F.3d 1239, 1241 (7th Cir. 1993) (no reasonable expectation of privacy in common hallways of apartment building); United States v. Holland, 755 F.2d 253, 255-56 (2d Cir. 1985) (same); United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991) (same); United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (same); but see United States v. Carriger, 541 F.2d 545, 551 (6th Cir. 1976) (holding residents have reasonable expectations of privacy in apartment hallways). We find the reasoning in the Commonwealth's arguments unpersuasive because a significant difference exists between hallways in an apartment building and those in rooming houses.

> [C]ommon hallways in unlocked apartment buildings, . . .
> generally serve only to connect separate, self-contained living units
> typically complete with all of the traditional living areas (i.e.,
> bathrooms, dining rooms, living rooms, kitchens, etc.). Interior
> hallways in rooming houses are protected only by virtue of linking
> such traditional rooms within the house--they provide rooming
> house residents with the only means of access to these rooms, and
> are an inseparable feature of their "home." In other words, it is not
> any inherent nature of a hallway that controls, but rather what the
> hallway links (i.e., individual self-contained living units versus
> shared traditional living areas).

Titus, 707 So. 2d at 711.

It is not likely this issue would be seriously debated if the circumstances involved several families or individuals renting a vacation home and the issue was whether police officers could enter the shared kitchen, hallways, or bathrooms without invading the dweller's privacy.

> The privacy interests here sought to be vindicated might well be analogized to the common practice among middle income persons of renting a "group home" for the summer or winter, in which each person or couple occupies a bedroom, but shares kitchen and bathroom facilities. Although privacy in common areas is thereby relinquished to some extent with respect to the other residents, it could not be seriously contended that the police are thereby permitted to enter such premises without announcing their authority, and to roam freely therein with guns drawn, without a warrant or exigent circumstances, neither of which was established here.

People v. Garriga, 596 N.Y.S.2d 25, 29 (N.Y. App. 1993).

Logan's residence was not a vacation home, but the regular dwelling for fifteen people. The rooming house "was not a hotel, restaurant, or public place where the public was invited or had the right to come and go at will." Brown v. United States, 83 F.2d 383, 385 (3d Cir. 1936). The rooming house was Logan's home "and so far as the unlawful entry and search affected him, it violated his constitutional rights." Id. at 386. We hold that the common areas of the rooming house were part of Logan's "home" within the meaning of the Fourth Amendment.

### III.

Citing Hill v. California, 401 U.S. 797, 804 (1971), and Shears v. Commonwealth, 23 Va. App. 394, 399, 477 S.E.2d 309, 311 (1996), the Commonwealth contends that even if Logan had a reasonable expectation of privacy within those common areas, the officer was justified in entering the dwelling, because he reasonably but mistakenly relied on the authority of an existing warrant to arrest James Chappell, whom he suspected Logan to be. Logan contends the Commonwealth failed to prove the officer acted reasonably or in good faith.

Logan averred in his brief in support of his motion to suppress that 717 Jefferson Street, the rooming house, was his home and that the officer made a warrantless entry into the home without a search warrant and without an arrest warrant for him. Indeed, the Commonwealth's own evidence proved it was Logan's residence and the officer did not have a warrant to arrest Logan. Fourth Amendment principles dictate that "an entry to arrest and an entry to search for and to seize property implicate the same interest in preserving the privacy and the sanctity of the home, and justify the same level of constitutional protection." Payton, 445 U.S. at 588. Thus, warrantless entries and searches "'are subject only to a few specifically established and well-delineated exceptions . . . [, which] are jealously and carefully drawn and [require a] showing by those who seek exemption that the exigencies of the situation made that course imperative.'" Florida v. White, 526 U.S. 559, 568 (1999) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)).

The police officer had neither an arrest warrant for Logan nor a search warrant for the residence. He testified that when he saw Logan on the street he "thought [Logan] was an individual by the name of James Chappell." The officer testified, however, he had not previously met either Logan or Chappell. The only objective facts that he relates to support his belief are that Chappell "was approximately five foot, seven inches tall," weighed about two hundred pounds, and was a black male. Yet, he learned after the arrest that Chappell "had a little more weight on him than Logan." The officer also had information that Chappell "was supposed to be hanging around" the neighborhood. This general information would not lead a reasonable person to conclude that Logan was Chappell. Indeed, by Officer Pace's own testimony, he had intended to ask Logan his identity when he saw him on the street.

Adams testified the officer asked her if she knew James Chappell. She said she told him that Logan was not that person. The officer testified he "asked [Adams] who it was and she said

- 10 -

it was James." He did not testify that he used a surname when he made his inquiry or inquired further when Adams merely said the man was James. In either event, these circumstances demonstrate that the officer's conclusion that Logan was Chappell was merely a hunch or suspicion.

Assuming Officer Pace subjectively believed Logan was Chappell, the evidence did not prove his belief was objectively reasonable. The Supreme Court and this Court have held that a mistaken arrest was reasonable when the arrest was based on specific, detailed information as to the time and place where the arrestee would be found. Hill, 401 U.S. at 803; Shears, 23 Va. App. at 399-400, 477 S.E.2d at 311. In Hill, one of two arrested drug dealers implicated Hill in a robbery and told police officers he was "currently" sharing an apartment with Hill at 9311 Sepulveda Boulevard in Los Angeles. 401 U.S. at 798. This information was timely and specifically named the place where police could locate Hill. The police officer then used official records to verify Hill's "prior association with [the arrested drug dealer], his age and physical description, his address, and the make of his car. Id. at 799. All of this information "corresponded with the general description by the robbery victims and the statements made by [the arrested informants]." Id. When police went to Hill's apartment, Hill's name was on the mailbox and a man who closely matched Hill's description answered the door. Id. These facts connected the two men both by description and location. Thus, the facts supported the conclusion "that the arresting officers had a reasonable, good faith belief that the arrestee Miller was in fact Hill." Id. at 802 (noting that "'[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest'").

The details of description and place that made the mistaken arrest reasonable in Shears were similar.

It is uncontroverted that the detectives were vested with the authority of the warrant for Boyce when defendant was arrested at the informant's trailer. The informer was instructed to telephone Boyce, an individual known to police as a drug dealer reputed for quick response to solicitations. Within minutes after the informer advised the detectives that he had contacted Boyce as directed, defendant arrived and entered the trailer. The detectives had previously seen neither defendant nor Boyce, but defendant's appearance was consistent with Boyce's "general description," and his comments were suggestive of an impending narcotics transaction. Under such circumstances, the police clearly acted both in good faith and reasonably in arresting defendant, as Boyce, albeit in error.

Shears, 23 Va. App. at 399-400, 477 S.E.2d at 311.

By Officer Pace's own admission, he had never seen either Logan or Chappell and had only a general description of Chappell. Additionally, no information linked Chappell to the residence. When the officer asked the woman at the door who the man was that entered, he received no indication that it was Chappell. Even if the woman's response could be deemed ambiguous, the officer made no further inquiry. Thus, the officer's testimony raised doubt whether he even believed that he was following Chappell. The details and information that made the mistake reasonable in Hill and Shears were missing here. Officer Pace was acting on a two-month-old warrant and information that Chappell was "hanging out" in the neighborhood. The details as to a specific place were lacking, as was the accuracy of the description. The officer did not testify that Logan is about the same height as Chappell. He testified that Chappell weighed 200 pounds and was heavier than Logan. We cannot say under these facts that Officer Pace's mistaking Logan for Chappell was objectively reasonable.

For the aforementioned reasons, we reverse the trial judge's denial of Logan's motion to suppress.

Reversed.

Haley, J., dissenting.

## I.

I respectfully dissent.

It is fundamental that an individual may only assert a Fourth Amendment violation if he has "a reasonable expectation of privacy" in the place searched or location where he is arrested. Rakas v. Illinois, 439 U.S. 128, 130 (1978); Katz v. United States, 389 U.S. 347, 351 (1967); DeLong v. Commonwealth, 234 Va. 357, 363, 362 S.E.2d 669, 672 (1987), cert. denied, 485 U.S. 929 (1988); Hardy v. Commonwealth, 17 Va. App. 677, 680, 440 S.E.2d 434, 436 (1994).[5]

It is likewise established that in support of a motion to suppress, the defendant has the burden of proving he had a reasonable expectation of privacy in the place searched or the location where he is arrested. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Barnes v. Commonwealth, 234 Va. 130, 135, 360 S.E.2d 196, 200 (1987); Sharpe v. Commonwealth, 44 Va. App. 448, 455, 605 S.E.2d 346, 349 (2004). "[I]n order to claim the protection of the Fourth Amendment, *a defendant must demonstrate* that he personally has an expectation of privacy in the place searched . . . ." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (emphasis added).

Succinctly stated, the establishment of a reasonable expectation of privacy is a condition precedent to asserting the protection of the Fourth Amendment, and the defendant has the *burden of production*, the burden of presenting evidence supporting that expectation.

## II.

With respect to the motion to suppress in the instant case, only two witnesses testified, Marilyn Elizabeth Adams and Officer Jerry Pace. Ms. Adams was a resident in the rooming house, in room one on the first floor. She testified the rooming house had three floors, with

---

[5] In Fourth Amendment jurisprudence, for analytical purposes, the establishment of "a reasonable expectation of privacy" has replaced the classic concept of asserting "standing." See Minnesota v. Carter, 525 U.S. 83, 85 (1998); Rakas, 439 U.S. at 139-40.

"about" fifteen tenants, was owned by a James Gunn, and appellant lived "all way upstairs in the attic."[6] Upon being asked how long appellant had lived in the rooming house, she replied: "I'm not sure . . . about two or three weeks." She testified that there was a "No trespassing" sign and a sign which said either "knock" or "ring" for entry, both of which were posted on the glass in the front door. At the time appellant and a Joyce Searles entered the rooming house, and when Officer Pace followed less than "five minutes" later, Ms. Adams testified she was "standing in the [open front] doorway." She knew that Joyce Searles was not a resident of the rooming house and had entered with appellant to consummate a drug transaction. She testified that Officer Pace passed by her in the open doorway, saying only "good evening," and that she said nothing to him.

Officer Pace testified he thought appellant was one Chappell, for whom there were outstanding arrest warrants. He did not see either the "No trespassing" or "ring" (or knock) to enter signs, presumably because they were posted on the glass of the front door, which he testified, in accordance with Ms. Adams, was "standing open." He did testify, however, that there was "a sign hanging on like a lamp post or something out front that says 'Rooms.'" He testified he knew the building was a rooming house and had been inside before. After entering the front door, there was a central hallway, with rooms on each side, which led to a stairway. Officer Pace said he walked down the hallway, rounded a bend in the stairway leading to the second floor, and saw appellant and Searles standing above him on the second floor stairway

---

[6] Presumably, appellant did have a reasonable expectation of privacy "in the attic," if that in fact was his personal residence. "[T]he occupant of a room in a boarding house . . . is entitled to constitutional protection against unreasonable searches and seizures." Stoner v. California, 376 U.S. 483, 490 (1964). This Court had likewise affirmed such an expectation with respect to motel rooms. See McCary v. Commonwealth, 36 Va. App. 27, 36, 548 S.E.2d 239, 243-44 (2001); Jones v. Commonwealth, 16 Va. App. 725, 727, 432 S.E.2d 517, 518 (1993); Servis v. Commonwealth, 6 Va. App. 507, 514, 371 S.E.2d 156, 159 (1988).

landing. It was at this location that Officer Pace saw the appellant holding, and then dropping, the "rock" of cocaine.

Thus, the issue in the motion to suppress was whether appellant had met his burden of production, of producing evidence to show he had "a reasonable expectation of privacy" on the second floor stairway landing. I submit he did not.

III.

The majority cites State v. Titus, 707 So. 2d 706 (Fla. 1998), for the proposition that a resident can have a reasonable expectation of privacy in a rooming house. That case was an appeal from a decision of the Court of Appeals of Florida, Fourth District, reported as Titus v. State, 696 So. 2d 1257 (1997). It is clear from that decision that the defendant produced evidence in his motion to suppress supporting a conclusion that he in fact had a reasonable expectation of privacy in a rooming house common kitchen. "The residents testified that the house is, effectually, private for the tenants and their guests, and that the kitchen is available for use only by the tenants. In fact, some of the tenants store personal belongings in the kitchen." Id. at 1258.

The majority also cites Bryant v. United States, 599 A.2d 1107 (D.C. App. 1991). Again, however, the court noted:

> The evidence shows that 4621 Georgia Avenue was not obviously a rooming house open to the public. . . . [T]he 4600 block of Georgia Avenue had private homes, not apartment buildings . . . . At the suppression hearing Sergeant McGuire explained that "once inside the house, it *turned out to be* a rooming house" . . . [and there was] . . . proof of appellant's "authority to exclude others from the area entered and searched . . . ." Appellant testified that the tenants shared the use of the kitchen, and nothing in the record suggests that the residents had relinquished their authority to exclude uninvited persons from the kitchen and adjoining areas.

599 A.2d at 1109-10.

- 15 -

Likewise, in citing United States v. Booth, 455 A.2d 1351 (D.C. App. 1983), the majority does not address the evidence adduced by the defendant.

> [T]he rooming house . . . and thus its front hallway—was not open to the general public. Indeed, we note that Officer Terrell, upon his arrival, did not even perceive that 1620 Swann Street, N.W. was a rooming house. Thus, if a stranger appeared at the front door, appellees, as residents, had authority, and were in a position, to deny entry.

455 A.2d at 1354.

IV.

Momentarily setting aside the question of the burden of production of evidence supportive of a reasonable expectation of privacy in the hallways or stairwells of an apartment or rooming house, it should be noted that a number of courts have held that as a matter of law, there can be no such expectation in such areas.

In United States v. Anderson, 533 F.2d 1210, 1214 (D.C. Cir. 1976), the Federal Court of Appeals, as quoted by the majority, held:

> "When the police officers entered the rooming house they did not enter appellant's private dwelling; instead they merely entered the common corridors of the building, which were available to residents of the rooming house, their guests, people making deliveries, and others who had a legitimate reason to be on the premises. Consequently, insofar as appellant maintains that he had a constitutionally protected reasonable expectation of privacy in the corridors of the rooming house, we disagree; appellant's constitutionally protected privacy interest began at the door to room eight rather than at the door to the entire rooming house."

The majority of federal courts have reached that conclusion. See United States v. Nohara, 3 F.3d 1239, 1241 (9th Cir. 1993) ("we conclude that any expectation Nohara might have had [in an apartment hallway] is not one that society recognizes as reasonable"); United States v. Barros-Moriera, 872 F.2d 12, 14 (2d Cir. 1989), cert. denied, 493 U.S. 953 (1989) ("Here the police entry was into a common [apartment] hallway, an area where there is no

- 16 -

legitimate expectation of privacy . . . even though the area was guarded by a locked door.");

United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991) (apartment common areas);

United States v. Eisler, 567 F.2d 814, 816 (8th Cir. 1977) (apartment hallway); United States v.

Cruz Pagan, 537 F.2d 554, 558 (1st Cir. 1976) (apartment garage).

V.

In McCoy v. Commonwealth, 2 Va. App. 309, 312, 343 S.E.2d 383, 385 (1986), this

Court held that the defendant visiting in an apartment did not therein have such a reasonable

expectation of privacy, noting, *inter alia*, that "the *evidence* . . . failed to show . . . [that appellant

possessed] . . . a right to exclude others from the premises . . . ." (Emphasis added). The Court

recognized that it was the defendant's burden to produce evidence supportive of his claim of a

reasonable expectation of privacy.

In the instant case, as summarized above, the uncontradicted evidence shows that (1) the

door to the rooming house was open, thereby presumably hiding a view of any signs posted upon

it, and concomitantly permitting entry by anyone; (2) a sign posted outside the front of the

rooming house read "Rooms"; any reasonable inference from that sign must include the

proposition that it was an invitation to enter and inquire as to the availability of a room to let, and

an invitation open to the public; (3) Ms. Adams claimed no ownership or managerial or

residential authority to exclude, or not exclude, anyone from the rooming house, and said

nothing to Officer Pace as he entered; and (4) Officer Pace knew the building was a rooming

house when he entered, having previously been to the location. That being said, there is no

evidence whatsoever as to any rules or agreements or practices, from any source, such as the

owner or manager or residents, with respect to whom, or under what conditions, one could enter,

or not enter, the rooming house and its common areas. Finally, the appellant offered no evidence

"that he *personally* [had] an expectation of privacy" in the second story stairwell landing.

Carter, 525 U.S. at 88 (emphasis added).

VI.

In Sharpe, 44 Va. App. at 454, 605 S.E.2d at 349, this Court stated:

> On appeal of a ruling on a motion to suppress, we view the evidence in the light most favorable to the prevailing party, here the Commonwealth, granting to the evidence all reasonable inferences deducible therefrom. Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). "[W]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them," McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc), but we review *de novo* the trial court's application of defined legal standards such as whether a defendant had a reasonable expectation of privacy sufficient to permit him to raise a Fourth Amendment challenge to a search, United States v. Gordon, 168 F.3d 1222, 1225 (10th Cir. 1999).

Applying that standard, I would hold the appellant failed to produce evidence sufficient to prove that he had a reasonable expectation of privacy in the second floor stairwell landing of the rooming house. I would affirm the ruling of the trial court denying the motion to suppress and, accordingly, the conviction of the appellant.